## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

ANIMAL WELFARE INSTITUTE,
900 Pennsylvania Avenue SE
Washington, DC 20003,

*Plaintiffs*,

v.

DAVID BERNHARDT, *in his official
capacity as Secretary of the U.S. Department
of the Interior*,
1849 C Street NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR,
1849 C Street NW
Washington, DC 20240,

*Defendants*.

Case No.  1:20-cv-1532

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs Center for Biological Diversity and Animal Welfare Institute

(collectively "Plaintiffs") challenge the failure of Secretary of the Interior David Bernhardt and

the Department of the Interior ("Defendants") to respond to a 2014 petition ("the Petition") filed

pursuant to the Administrative Procedure Act ("APA"). The Petition requested that Defendants

"certify" Mexico under the U.S. Pelly Amendment for Mexico's ongoing failure to halt illegal

fishing of and international trade in endangered totoaba fish. *See* 22 U.S.C. § 1978(a)(2). This

take and trade violates and "diminishes the effectiveness" of the Convention on International

Trade in Endangered Species of Fauna and Flora ("CITES") and is contributing to the imminent extinction of the vaquita, a critically endangered porpoise. *Id.*

2.      Likely only 10 vaquita remain on Earth. Vaquita face a single threat: they become entangled and drown in fishing gear, including in gear set illegally to catch totoaba, a giant, endangered fish. Totoaba are traded on the black market from Mexico to China, where the totoaba's swim bladder is believed to have medicinal properties.

3.      Totoaba and vaquita are both protected under CITES as Appendix-I species, and thus international, commercial trade in both species is prohibited. Mexican law also prohibits totoaba fishing.

4.      Yet for years, Mexico has failed to enforce these bans on totoaba fishing and trade, and as a result, the vaquita population has plummeted. If Mexico does not take serious, immediate, and concerted action to increase enforcement, the vaquita may be extinct by next year.

5.      Under the Pelly Amendment, if "the Secretary of the Interior . . . finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of any international program for endangered or threatened species, the Secretary . . . shall certify such fact to the President." 22 U.S.C. § 1978(a)(2). Upon the Secretary's certification of a nation, the President is authorized to direct the Department of Treasury "to prohibit . . . the importation into the United States of any products from the offending country." *Id.* § 1978(a)(5).

6.      The Petition, filed September 29, 2014, requested that the Secretary of the Interior certify Mexico for trade and taking of totoaba that "diminishes the effectiveness" of CITES, pursuant to the APA and the Pelly Amendment. 5 U.S.C. § 553(e); 22 U.S.C. § 1978(a)(2).

7.      Defendants have not made a final determination on the Petition as of the date of this Complaint's filing.

8.      Defendants' delay in responding to the 2014 Petition is unlawful, unreasonable, and violates the APA. 5 U.S.C. §§ 555(b), 706(1). More than five years have passed since the Petition's filing, and during this time, Mexico's totoaba taking, trade, and violations of CITES has continued, as the vaquita's population has declined precipitously.

9.      Plaintiffs file this Complaint pursuant to the APA seeking a declaratory judgment and injunctive relief to compel Defendants to respond substantively to the Petition by a date certain, as well as Plaintiffs' fees and costs associated with the litigation.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States), 28 U.S.C. § 1346 (action against the United States), 28 U.S.C. § 1361 (power to issue writs of mandamus), 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments and injunctive relief in cases of actual controversy), and 5 U.S.C. § 702 (APA jurisdiction for those adversely affected by agency action).

11.     This lawsuit is brought pursuant to the APA. 5 U.S.C. §§ 551–559, 701–706. Plaintiffs seek judicial review under the APA. *Id.* § 706(1). The requested relief is authorized under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), 5 U.S.C. § 706 (APA), and the Court's equitable powers.

12.     Venue properly lies in this District under 28 U.S.C. § 1391(e)(1), as this civil action is brought against an agency of the United States and an officer and employee of the United States acting in his official capacity; Defendants reside and are headquartered in the

District of Columbia; and a substantial part of the events and omissions giving rise to the claim

occurred in the District of Columbia.

13.     The APA provides waiver of the federal government's sovereign immunity. 5

U.S.C. § 702.

## PARTIES

14.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) nonprofit

corporation incorporated in the State of California that maintains offices across the country,

including in Washington, DC, California, Arizona, Florida, New York, Oregon, and Washington

State, and in Baja California Sur, Mexico. The Center works through science and environmental

law to advocate for the protection of endangered, threatened, and rare species and their habitats

both in the United States and abroad. The Center has over 74,000 active members and around 1.7

million online activists.

15.     The Center and its members have a strong and longstanding interest in protecting

imperiled marine mammals and fish like the vaquita and the totoaba. Through its International

and Oceans Programs, the Center has worked for years to protect marine mammals within the

United States and abroad that are threatened by unsustainable or harmful fishing practices,

including through advocacy, litigation, and participation as appointed members of five take

reduction teams under the Marine Mammal Protection Act. The Center has a long history of

actively advocating for protection of the imperiled vaquita and the totoaba within the United

States, in Mexico, and at numerous international forums.

16.     Members of the Center reside throughout the United States, in Mexico, and in

other countries. The Center has members who have visited and have specific plans to return to

the vaquita's habitat in Mexico's Upper Gulf of California. For example, Mr. Brett Hartl, a

member who resides in Arizona, lived in the Upper Gulf in 2003 for ten weeks and traveled extensively in the area. He visited San Felipe, near the vaquita's habitat, in 2009 and 2018 and attempted to view, study, and photograph the vaquita. Mr. Hartl had planned to return to the Upper Gulf this September to again attempt to view the vaquita, but these plans have been postponed because of the coronavirus pandemic. He now plans to return to the Upper Gulf to attempt to view vaquita in May or June of 2021, assuming it is safe to travel at that time due to COVID-19. Another Center member, Mr. Taylor McKinnon, has been visiting the Upper Gulf regularly since childhood. He has visited San Felipe and the surrounding coast six times, including in 2016, 2017, and 2018, kayaking, taking photos, and looking for vaquita. He plans to take the same trip in October of 2020, if allowed and safe given COVID-19 recommendations, and to continue such annual trips in the future, as he has done in the past. Mr. Alejandro Olivera is a Center member who resides in California Baja Sur, Mexico and regularly visits the Upper Gulf and the vaquita's habitat, including six trips over the past 11 years. Each time Mr. Olivera visits the Upper Gulf, he attempts to view a vaquita, including from on the water, and he has also seen gillnets being used near San Felipe. Mr. Olivera planned to return to the vaquita's habitat to attempt to see the vaquita and evaluate on-the-water enforcement by Mexican officials in April of this year, including booking travel; however, he cancelled those plans due to the coronavirus pandemic. Mr. Olivera has rescheduled his trip and now plans to visit the vaquita habitat in the fall of 2020, if permissible under COVID restrictions, and will continue to return to the Gulf regularly in the future, as he has in the past.

17.     Plaintiff Animal Welfare Institute ("AWI") is a non-profit animal advocacy organization with its principal place of business in Washington, DC. Since its founding in 1951, AWI's mission has been to end human-inflicted animal suffering and exploitation by vigorously

defending animals' interests through the law. AWI has a longstanding and well-established interest in protecting the lives and habitats of wildlife, including marine wildlife, from harassment, encroachment, and destruction. AWI's wildlife advocacy department works diligently to protect all fauna—terrestrial and marine—from suffering caused by people; to conserve and recover threatened and endangered species; and to secure protections for animals by engaging with policymakers, scientists, and industry at state, federal, and international levels.

18.     AWI advocates for the protection of marine wildlife, including cetaceans, in Mexico and across the globe. Its advocacy efforts include speaking on behalf of marine species in international forums such as the International Whaling Commission ("IWC," including its Scientific Committee), the Convention on Biological Diversity, CITES, and the World Heritage Convention; educating constituents and members about cetaceans and the threats they face; and monitoring legislation and research activities that may affect their well-being.

19.     AWI promotes increased protections of marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI is a member of the IWC's Bycatch Mitigation Initiative Standing Working Group and frequently comments on Marine Stewardship Council fisheries assessments on the impacts of fisheries on cetaceans. AWI seeks an end to the indiscriminate use of gillnets, which are responsible for the deaths of hundreds of thousands of marine mammals each year and have driven the critically endangered vaquita to the edge of extinction. In its efforts to save the vaquita, AWI has expended considerable time and organizational resources to meet with government officials in Mexico and the United States and to advocate for the species in various international forums, organized and participated in events to educate governmental delegates to international meetings about the species and its threats, and collaborated with other

international and non-governmental organizations on projects to promote the protection and

recovery of the species.

20.     AWI has nearly 26,000 members worldwide, including members in Mexico and

the southwest United States who reside near the Upper Gulf of California. AWI members

strongly desire to increase protections for the vaquita and its habitat in order to increase the

vaquita's likelihood of recovery. AWI members live near or have traveled to the Upper Gulf of

California and have specific plans to return to try to observe vaquita. For example, AWI member

Kate O'Connell traveled to the Upper Gulf several times in the 1990s, including attending the

official designation of the Biosphere Reserve in 1993. She visited Puerto Peñasco and Guaymas

in Sonora in 1993 and 1994 and San Felipe in Baja California Norte in 1995 and 1999. During

her 1995 trip to San Felipe, Ms. O'Connell was fortunate enough to catch a fleeting glimpse of

two live vaquita from a small boat. Ms. O'Connell visited the Upper Gulf of California

Biosphere Reserve, Golfo Santa Clara, and Puerto Peñasco in 2018 and spoke with fishers and

tour operators about the vaquita. Ms. O'Connell had planned to visit the Upper Gulf this

September to again attempt to view vaquita, but these plans have been postponed due to the

coronavirus pandemic. She now plans on returning to the Upper Gulf to attempt to view vaquita

in the spring of 2021 when it is safe to travel. Another AWI member lives in the region near the

vaquita's habitat and has a longstanding interest in the vaquita's conservation. The member

regularly views the vaquita's habitat and has witnessed illegal fishing there.

21.     Plaintiffs and their members derive aesthetic, recreational, scientific, educational,

conservation, and other benefits from the existence of the vaquita in the wild. These interests

have been, are, and will be directly, adversely, and irreparably affected by Defendants' violation

of the law. As the vaquita population declines, Plaintiffs' members are less likely to view the

7

vaquita in the wild. Further, these members' enjoyment of viewing the vaquita's marine habitat is decreased by observing vaquita-killing gillnets in the vaquita's waters.

22.     Plaintiffs' members will continue to be prejudiced by Defendants' unlawful actions unless and until this Court provides the relief prayed for in this Complaint.

23.     Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior. In this capacity, Secretary Bernhardt directs all business of the Department of the Interior. Under the Pelly Amendment, Secretary Bernhardt is responsible for determining whether to "certify" nations if taking or trade by foreign nationals is diminishing the effectiveness of international agreements for endangered species. In his official capacity, Secretary Bernhardt is responsible for the violations alleged in this Complaint.

24.     Defendant U.S. Department of the Interior is the agency led by the Secretary of the Interior. The U.S. Department of the Interior is responsible for the violations alleged in this Complaint.

## LEGAL BACKGROUND

### A.     The Convention on International Trade in Endangered Species

25.     CITES is a multilateral treaty governing trade in imperiled species. CITES, *opened for signature* March 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 (entered into force July 1, 1975). CITES recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international co-operation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id.*, Preamble.

26.     To receive protection under CITES, species must be included on one of CITES' three Appendices, and each Appendix offers a different level of protection.

8

27.     Species included on CITES Appendix I are "threatened with extinction" and are thus "subject to particularly strict regulation in order not to endanger further their survival." CITES, art. II(1). CITES strictly bans all commercial, international trade in Appendix-I species. *Id.*, art. III(1), (3).

28.     CITES further requires that each Party "shall take appropriate measures to enforce the provisions of [CITES] and to prohibit trade in specimens in violation thereof." CITES, art. VIII(1).

29.     The United States, Mexico, and 181 other nations are Parties to CITES.

**B.    The Pelly Amendment**

30.     Enacted in 1971 and amended in 1978, the Pelly Amendment to the Fishermen's Protective Act ("the Pelly Amendment") provides the United States leverage to prompt other nations' compliance with international conservation agreements through trade restrictions.

31.     The Pelly Amendment requires that:

When . . . the Secretary of the Interior, in consultation with the Secretary of State, finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of any international program for endangered or threatened species, the Secretary . . . shall certify such fact to the President.

22 U.S.C. § 1978(a)(2).

32.     The Pelly Amendment further requires the Secretary to: (A) "periodically monitor" activities of foreign nationals that may affect international programs; (B) "promptly investigate any activity that . . . may be cause for certification;" and (C) "promptly conclude; and reach a decision with respect to; any [such] investigation." 22 U.S.C. § 1978(a)(3). A citizen may petition for a Pelly certification.

33.     Under the Pelly Amendment, an "international program for endangered or threatened species" is "any ban, restriction, regulation, or other measures in effect pursuant to a multilateral agreement which is in force with respect to the United States, the purpose of which is to protect endangered or threatened species of animals." 22 U.S.C. § 1978(h)(4).

34.     The Pelly Amendment defines "taking" to include "harm[ing], . . . kill[ing], trap[ping,] [or] collect[ing]" an animal or attempting to do so. 22 U.S.C. § 1978(h)(5).

35.     Upon receiving a Pelly certification from the Secretary, the President is authorized "to direct the Secretary of the Treasury to prohibit . . . the importation into the United States of any products from the offending country." 22 U.S.C. § 1978(a)(5). Further, the President "shall" notify Congress of his decision within 60 days of the Secretary's certification, and if the President "fails" to prohibit importation or does not prohibit "all fish . . . or wildlife products" from the certified country, the President "shall" inform Congress of the reasons. *Id.* § 1978(b).

36.     Once products are prohibited, the Pelly Amendment makes any subsequent importation illegal. 22 U.S.C. § 1978(c).

**C.     The Administrative Procedure Act**

37.     The Administrative Procedure Act requires that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). The APA further requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," *id*. § 555(b), and that agencies give "prompt notice" if they deny a petition, providing "a brief statement of the grounds for denial," *id.* § 555(e).

38.     The APA provides a cause of action to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute." 5 U.S.C. § 702. Under the APA, an agency action includes an agency's "failure to act." *Id.* § 551(13). The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

### A.      Totoaba Fishing and Trade and the Vaquita's Perilous Decline

39.      The vaquita (*Phocoena sinus*) is the world's smallest porpoise, reaching around five feet in length, with dark grey patches around its eyes and mouth. Vaquita inhabit only one place in the world: Mexico's Upper Gulf of California.

40.      Vaquita are critically endangered. The CITES Parties included the vaquita on Appendix I of CITES in 1979. The United States listed the vaquita under its Endangered Species Act ("ESA") in 1985. 50 Fed. Reg. 1056 (Jan. 9, 1985) (listing *Phocoena sinus*).

41.      The vaquita's sole threat is entanglement in gillnet gear. Gillnets are a type of non-selective fishing gear hung vertically in the water column sometimes for hours or even days. In addition to capturing target fish, gillnets also often capture and kill non-target fish and other marine life, including marine mammals and turtles that drown once entangled.

42.      The vaquita's population has declined due to entanglement in gillnet gear set in the region's totoaba, shrimp, curvina, sierra, and chano fisheries.

43.      Totoaba (*Totoaba macdonaldi*) are large, schooling marine fish that inhabit the Gulf of California and grow to around five feet in length. A portion of the totoaba's annual spawning habitat overlaps the vaquita's habitat in the Upper Gulf.

44.      The totoaba's swim bladder, also referred to as "maw," is in high demand in China, as it resembles the bladder of a now-nearly-extinct Chinese fish called the bahaba. A swim bladder is a gas-filled organ that controls the fish's buoyancy. Totoaba swim bladders are

believed by some to have medicinal properties, including curing arthritis, boosting fertility, improving skin and circulation, and slowing bleeding. Large swim bladders are also purchased for investment purposes, collectables, or as gifts. Totoaba swim bladders can sell for $46,000 per kilogram.

45.     The totoaba population declined due to overfishing, and in 1975, Mexico banned totoaba fishing.

46.     In 1977, the CITES Parties included totoaba on Appendix I of the treaty. Totoaba remains on CITES Appendix I today. As a result, CITES bans commercial trade in totoaba and totoaba parts and derivatives.

47.     In 1979, the National Marine Fisheries Service ("NMFS") listed totoaba as endangered under the ESA. 44 Fed. Reg. 29,478 (May 21, 1979) (listing *Cynoscion macdonaldi*, a taxonomic synonym of *Totoaba macdonaldi*). Totoaba remain listed as endangered today. 50 C.F.R. § 17.11(h).

48.     Totoaba has also been assessed as "Critically Endangered" by the International Union for the Conservation of Nature. *See* https://www.iucnredlist.org/species/22003/9346099.

49.     Around 2010, when an estimated 200 vaquita remained, illegal totoaba fishing within the vaquita's habitat surged, due to "increased demand in Chinese markets for the [totoaba's] swim bladder." Report of the Fifth Meeting of the International Committee for the Recovery of the Vaquita. Ensenada, Baja California, July 8-10, 2014, at 15 ("CIRVA-5").

50.     Accordingly, in 2014, the international vaquita expert group CIRVA (the Comité Internacional para la Recuperación de la Vaquita) formally recommended "that all available enforcement tools, both within and outside Mexico, be applied to stopping illegal fishing, especially the capture of totoabas and the trade in their products." CIRVA-5, at 2.

12

51.     Yet Mexico failed to enforce both its own domestic ban on totoaba fishing and CITES' ban on totoaba trade, and the vaquita population plummeted.

52.     In 2016, CIRVA reported "extensive evidence of totoaba poaching," including retrieval of 42 illegal gillnets in the Upper Gulf and three dead vaquita due to entanglement. Seventh Meeting of the Comité Internacional para la Recuperación de la Vaquita. Ensenada, BC, May 10-13, 2016, at 5, 4. The vaquita population fell to around 60 individuals. *Id.* at 4. CIRVA stated that "the vaquita will soon be extinct" "unless enforcement and prosecution efforts succeed in preventing illegal fishing." Eighth Meeting of the Comité Internacional para la Recuperación de la Vaquita, La Jolla, CA, Nov. 29-30, 2016.

53.     In spring of 2017, five more vaquita were found dead, and net removal teams found 150 active totoaba nets in the Upper Gulf. Report of the Ninth Meeting of the Comité Internacional para la Recuperación de la Vaquita. La Jolla, CA, April 25-26, 2017, at 4. CIRVA reported that "[i]llegal fishing activity for totoaba ha[d] continued at a very high level and poachers [we]re operating openly both day and night in the Upper Gulf." *Id.* CIRVA recommended that the Mexican government "launch – with the utmost urgency – intelligence-led enforcement operations to dismantle illegal fishing operations as well as the organized criminal syndicates driving the international trade in totoaba." *Id.* at 12. CIRVA reported the vaquita had declined to around 30 individuals. *Id.*

54.     Illegal fishing and the vaquita's decline continued unabated. In 2018, CIRVA wrote to the Mexican government with alarm, stating that "only about 10 vaquitas remained alive in 2018." Report of the Eleventh Meeting of the Comité Internacional para la Recuperación de la Vaquita. La Jolla, CA, Feb. 19-21, 2019, at 5 ("CIRVA-11"). CIRVA explained that "[e]ach year, half of the remaining vaquitas are killed in illegal fishing nets set for . . . totoaba," which

are "smuggled by organized crime cartels to China." *Id.* at 2. Yet "high levels of illegal fishing for totoaba" continued to occur in the vaquita's habitat, and net removal rates suggested "an *increase in illegal fishing* for totoaba." *Id.* at 2, 11 (emphasis is original). CIRVA concluded that Mexico's "[e]nforcement efforts have been completely ineffective in reducing the illegal totoaba fishery in the Upper Gulf of California." *Id.* at 12.

55.     Overall, the vaquita population declined 99 percent between 2011 and 2018. CIRVA has stated that for the vaquita to survive, Mexico must "eliminate all gillnet fishing in the area where the last few vaquita remain." CIRVA-11, at 2.

56.     Yet totoaba poaching with gillnets continues. On December 9, 2019, the Sea Shepherd Conservation Society reported sighting around 80 small boats setting and retrieving illegal gillnets in vaquita habitat in a single day. The organization estimated that around 500 totoaba were taken illegally that day. Upon information and belief, none of the fishermen involved in this incident have faced charges. In March 2020, a vaquita was reported dead and entangled in totoaba net.

57.     Yet hope for the vaquita remains. During the most recent surveys in fall of 2019, scientists observed six likely-distinct vaquita, including three mother-calf pairs. Other marine mammal populations, like the Northern elephant seal, have reached similarly low population numbers yet avoided extinction and have recovered.

**B.     International Concern over Mexico's Enforcement Failures**

58.     Numerous international bodies have raised serious concern with Mexico's failure to halt illegal totoaba fishing and trade.

59.     In 2016, the CITES Standing Committee, a body that oversees treaty implementation, addressed the ongoing illegal totoaba trade and specifically "urged Mexico to

strengthen implementation of CITES provisions that are applicable to totoaba." Summary

Record, 66th Meeting of Standing Committee, Geneva, Switzerland, Jan. 11-15, 2016, at 84.

60.     Later that year, the CITES Conference of the Parties directed Mexico and other

Parties to submit reports "on the number and quantity of seizures of illegal totoaba products,

arrests of those engaged in the illegal fishing and trade, [and] results of any prosecutions" for

further assessment by the Parties. CITES Dec. 17.148.

61.     After reviewing those submissions, in 2019, the CITES Parties directed Mexico

to, *inter alia*, "take immediate and effective actions by 1 November 2019 in response to the

threats to totoaba and vaquita posed by illegal trade," including "undertaking intelligence-driven

operations and investigations for addressing illegal trade in totoaba." CITES Dec. 18.293.

62.     The CITES Standing Committee will consider Mexico's implementation of these

directives and the treaty at its next meeting, currently scheduled for October 2020, and "if not

satisfied with timely progress," the Committee "shall" take action pursuant to the CITES

Compliance Procedures, which can include recommending Parties ban trade in Mexican wildlife

products. CITES Dec. 18.295.

63.     In July 2019 under the World Heritage Convention, the UNESCO World Heritage

Committee reviewed Mexico's management of its Islands and Protected Areas of the Gulf of

California World Heritage site, which covers the vaquita's habitat. The Commission officially

"expresse[d] its utmost concern that despite [Mexico's surveillance efforts] . . . illegal fishing of

totoaba has continued and even escalated in the Upper Gulf of California resulting in a threat of

imminent extinction of the vaquita population." WHC/19/43.COM/18. Paris, 23 July 2019. The

Committee therefore found that "illegal fishing represents an ascertained danger to" the site's

Outstanding Universal Values and voted to inscribe the site on the List of World Heritage in Danger, directing Mexico to develop corrective measures for its management of the site. *Id.*

64.     Also in 2019, the International Whaling Commission's Scientific Committee issued a formal report "yet again express[ing] its disappointment and frustration that, despite almost three decades of repeated warnings, the vaquita's rapid decline to extinction continues because of [Mexico's] ineffective management measures." Report of the Scientific Committee, Nairobi, Kenya, May 10-13, 2019, at 63-65. The report recommends that Mexico increase surveillance and enforcement, among other actions. *Id.*

**C.     The Pelly Petition and Defendants' Failure to Respond**

65.     On September 29, 2014, the Center filed the Petition pursuant to the APA and Pelly Amendment requesting that the Secretary of the Interior certify Mexico for trade and taking of totoaba that "diminishes the effectiveness" of CITES. 5 U.S.C. § 553(e); 22 U.S.C. § 1978(a)(2)

66.     The Petition describes the vaquita's precipitous decline; detailed how illegal fishing and trade are driving that decline; and explained how CITES prohibits commercial trade in totoaba, as an Appendix-I species, and requires Mexico to enforce that prohibition.

67.     The Petition then argues that, under the Pelly Amendment, Mexican nationals are engaging in "taking" and "trade" of endangered totoaba that "diminishes the effectiveness" of CITES for two reasons. 22 U.S.C. § 1978(a)(2). First, by failing to enforce CITES' ban on trade in totoaba, Mexico is directly violating CITES and diminishing the treaty's effectiveness. Second, continued illegal fishing and trade in endangered totoaba threatens both the totoaba and the vaquita's existence, and thus Mexico's actions "diminish the effectiveness" of CITES more broadly, as the treaty is intended to conserve both these species.

68.     Having received no formal response from Defendants granting or denying the

Petition, on June 28, 2016, the Center sent a letter requesting that Defendants urgently grant the

Petition. The letter documented ongoing, illegal totoaba fishing and trade and the vaquita's

continued decline.

69.     Still having received no response to the Petition, the Center sent an additional

letter to Defendants in January 2017, again documenting continued illegal totoaba fishing and

trade and further vaquita decline. The letter explained that Defendants' failure to respond to the

Petition constituted an "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

§ 706(1).

70.     On January 16, 2017, more than 60 conservation organizations, including the

Animal Welfare Institute, submitted a letter urgently requesting that Defendants certify Mexico

under the Pelly Amendment for totoaba taking and trade.

71.     On April 11, 2017, the Fish and Wildlife Service ("the Service"), an agency

within the Department of the Interior, sent a letter to the Center listing actions the Service had

taken regarding totoaba and vaquita and stating that "the conservation of these endangered

species remains, and always has been, a high priority for the Service." The Service stated that it

"anticipate[d] concluding [its] investigation into the matter [i.e., the Pelly Petition] within the

next four or five months," i.e., by August or September 2017.

72.     Plaintiffs have continued to meet with and request updates from the Service since

April 2017.

73.     More than five years have passed since the Petition was filed.

74.     Despite the APA's requirement that an agency respond to a petition "within a

reasonable time;" despite the vaquita's imminent extinction if illegal totoaba fishing and trade

Case 1:20-cv-01532   Document 1   Filed 06/11/20   Page 18 of 19

continue; and despite the Pelly Amendment's mandate that Defendants "shall" "promptly investigate," "promptly conclude . . . any investigation," and "certify" nations for diminishing the effectiveness of treaties, Defendants have failed to issue a response to the Petition or certify Mexico. Defendants' delay is unlawful and patently unreasonable.

## CLAIM FOR RELIEF

### Failure to Timely Respond to Petition

75.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

76.     On September 29, 2014, the Center filed the Petition requesting that the Secretary of the Interior certify Mexico for trade and taking of totoaba that "diminishes the effectiveness" of the Convention on International Trade in Endangered Species ("CITES"), pursuant to the Administrative Procedure Act ("APA") and Pelly Amendment. 5 U.S.C. § 553(e); 22 U.S.C. § 1978(a)(2).

77.     Under the APA, agencies must respond to petitions "within a reasonable time," and a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 555(b), 706(1). The APA provides judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702. "Agency action" includes the "failure to act." *Id.* § 551(13).

78.     More than five years have passed since the Petition was filed. Despite continued illegal totoaba fishing and trade and the vaquita's likely imminent extinction, Defendants have failed to substantively respond to the Petition.

79.     Accordingly, Defendants have unlawfully withheld and/or unreasonably delayed their response to the Petition in violation of the APA. 5 U.S.C. §§ 555(b), 706(1).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests this Court:

1. Declare that Defendants unreasonably delayed and unlawfully withheld their response to the Petition in violation of the APA;

2. Enter an order enjoining Defendants from further delay in responding substantively to the Petition and requiring a response within 30 days;

3. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4. Grant any other relief this Court finds just and proper.

Dated:  June 11, 2020                     Respectfully submitted,

                                          _/s/ Sarah Uhlemann_____
                                          Sarah Uhlemann
                                          DC Bar No. 501328
                                          Center for Biological Diversity
                                          2400 80th Street NW, #146
                                          Seattle, WA 98117
                                          (206) 327-2344
                                          suhlemann@biologicaldiversity.org

                                          Tanya M. Sanerib
                                          DC Bar No. 473506
                                          Center for Biological Diversity
                                          2400 80th Street NW, #146
                                          Seattle, WA 98117
                                          (206) 379-7363
                                          tsanerib@biologicaldiversity.org

                                          *Attorneys for Plaintiffs*